IN THE SUPREME COURT OF NORTH CAROLINA

No. 369PA18

Filed 3 April 2020

CABARRUS COUNTY BOARD OF EDUCATION

v.

DEPARTMENT OF STATE TREASURER, RETIREMENT SYSTEMS DIVISION; DALE R. FOLWELL, STATE TREASURER, in his official capacity; and STEVEN C. TOOLE, DIRECTOR, RETIREMENT SYSTEMS DIVISION, in his official capacity

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, published decision of the Court of Appeals, 821 S.E.2d 196 (N.C. Ct. App. 2018), affirming a judgment entered on 30 May 2017 by Judge James E. Hardin, Jr., in Superior Court, Wake County. Heard in the Supreme Court on 9 December 2019.

*Michael Crowell; and Tharrington Smith, LLP, by Deborah R. Stagner and Lindsay V. Smith, for petitioner-appellee.*

*Joshua H. Stein, by Matthew W. Sawchak, Solicitor General, Blake W. Thomas, Deputy General Counsel, Ryan Y. Park and James W. Doggett, Deputy Solicitors General, and Katherine A. Murphy, Assistant Attorney General, for respondent-appellants.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Elizabeth L. Troutman and Jill R. Wilson; and Allison Brown Schafer for North Carolina School Boards Association, amicus curiae.*

ERVIN, Justice.

This case involves a dispute between petitioner Cabarrus County Board of Education and the Retirement Systems Division of the Department of the State

Treasurer; State Treasurer Dale R. Folwell,[1] acting in his official capacity; and former executive director of the Retirement System, Steven C. Toole,[2] acting in his official capacity, concerning the manner in which the cost of pensions for certain retirees should be funded. Respondents manage the Teachers' and State Employees' Retirement System, which pays eligible retired state employees a fixed monthly pension based upon the retiree's four highest-earning consecutive years of state employment.

In 2014, the General Assembly enacted An Act to Enact Anti-Pension-Spiking Legislation by Establishing a Contribution-Based Benefit Cap, S.L. 2014-88, § 1, 2014 N.C. Sess. Laws 291, which is codified, in pertinent part, at N.C.G.S. § 135-5(a3). The Act establishes a retirement benefit cap applicable to certain employees with an average final compensation of $100,000 or more per year whose retirement benefit payment would otherwise be significantly greater than the contributions made by that retiree during the course of his or her employment with the State. *Id*. In order to calculate the benefit cap applicable to each retiree, the Act directs the Retirement System's Board of Trustees to "adopt a contribution-based benefit cap factor

---

[1] At the time that the Board of Education initiated this proceeding, Janet Cowell served as State Treasurer. As a result of the fact that he became State Treasurer on 1 January 2017, Mr. Folwell was substituted as a named respondent in lieu of Ms. Cowell.

[2] Mr. Toole was replaced as the executive director of the Retirement Systems Division by Interim Executive Director Thomas G. Causey in May 2019. Pursuant to N.C. R. App. P. 38(c), Mr. Causey is automatically substituted as a respondent for Mr. Toole. However, consistent with the custom of this Court, under which the caption of the case as it appeared in the trial court is deemed controlling, we continue to list Mr. Toole as a party-respondent.

recommended by the actuary, based upon actual experience, such that no more than three-quarters of one percent (0.75%) of retirement allowances are expected to be capped" and to calculate the contribution-based benefit cap for each retiring employee by converting the employee's total contributions to the Retirement System to a single life annuity and multiplying the cost of such an annuity by the cap factor. *Id.* In the event that the retiree's expected pension benefit exceeds the calculated contribution-based benefit cap, the Retirement System is required to "notify the [retiree] and the [retiree's] employer of the total additional amount the [retiree] would need to contribute in order to make the [retiree] not subject to the contribution-based benefit cap." N.C.G.S. § 135-4(jj) (2019). At that point, the retiree is afforded ninety days from the date upon which he or she received notice of the additional payment amount or the date of his or her retirement, "whichever is later, to submit a lump sum payment to the annuity savings fund in order for the [R]etirement [S]ystem to restore the retirement allowance to the uncapped amount." *Id.* The retiree's employer is entitled to "pay[ ] all or part of the . . . amount necessary to restore the [retiree's] retirement allowance to the pre-cap amount." *Id.*

According to N.C.G.S. § 135-6(*l*), "[t]he Board of Trustees shall designate an actuary who shall be the technical adviser of the Board of Trustees on matters regarding the operation of the funds created by the provisions of this Chapter." N.C.G.S. § 135-6(*l*) provides that "all the assumptions used by the [Retirement] System's actuary, including mortality tables, interest rates, annuity factors, and

employer contribution rates, shall be set out in the actuary's periodic reports or other materials provided to the Board of Trustees," with the materials to be "accepted by the Board [of Trustees]," N.C.G.S. § 135-6(*l*), and adopted by the Board of Trustees by means of an informal board resolution memorialized in its minutes pursuant to the Administrative Code. *See* 20 N.C. Admin. Code 2B.0202(a) (1981) (stating that "[a]ctuarial tables and assumptions will be adopted by the [B]oard of [T]rustees after the presentation of the recommendations of the actuary by including the tables, rates, etc. in the minutes of the [B]oard [of Trustees] with the resolution adopting said tables, rates or assumptions").

The Board of Trustees hired Larry Langer and Michael Ribble of Buck Consultants to serve as the "[c]onsulting [a]ctuary." At a meeting held by the Board of Trustees on 23 October 2014, Mr. Langer and Mr. Ribble presented certain calculations and assumptions, including summaries of expected retirement patterns, based upon a 2012 valuation of the Retirement System's assets and liabilities. The actuary then recommended a cap factor of 4.8, which the Board of Trustees unanimously approved.

Prior to his retirement on 1 May 2015, Dr. Barry Shepherd served as the superintendent of Cabarrus County Schools. In light of his employment history, Dr. Shepherd was eligible to receive benefits from the Retirement System. At the time of his retirement, the Retirement System determined that Dr. Shepherd's pension benefits were subject to the contribution-based benefit cap and informed both Dr.

Shepherd and the Board of Education that an additional contribution to the Retirement System in the amount of $208,405.81 would be required in order for Dr. Shepherd to receive the full retirement benefit to which he would have otherwise been entitled. Upon receiving this information, the Board of Education submitted the required amount on Dr. Shepherd's behalf.

On 18 October 2016, the Board of Education filed a request for a declaratory ruling asking that the invoice and the cap factor used to calculate the amount shown on the invoice be declared "void and of no effect because the [Board of Trustees] did not follow the rule making procedures of . . . the Administrative Procedure Act." According to the Board of Education, the cap factor was "not an actuarial assumption under 20 N.C. Admin. Code 02B.0202" and was not, for that reason, "exempt from the rule making procedures of the [Administrative Procedure Act]." On 17 November 2016, Mr. Toole denied the Board of Education's request on the grounds that the Board of Trustees "ha[d] statutory authority to adopt various recommendations of its actuary" and that its "adoption of a cap factor for the contribution-based benefit cap . . . based upon the recommendations of its actuary, [was] not void."

On 16 December 2016, the Board of Education filed a petition for judicial review in the Superior Court, Cabarrus County, in which it sought a declaratory ruling that (1) "the cap factor is a rule within the meaning of [N.C.]G.S. [§] 150B-2(8a) and that it may be adopted by the . . . Board of Trustees and implemented by the Retirement System[ ] . . . only by complying with the rule making procedures of

Article 2A of the [Administrative Procedure Act]"; that (2) "the cap factor adopted by the . . . Board of Trustees . . . is void and of no effect because of the failure of the [Board of T]rustees to follow the rule making procedures of Article 2A of the [Administrative Procedure Act]"; that (3) "the respondents may not implement [N.C.]G.S. [§] 135-5(a3) until a cap factor is adopted in compliance with the rule making procedures of Article 2A of the [Administrative Procedure Act]"; and that (4) "the Retirement System['s] . . . assessment of $208,405.81 against [the Board of Education] is void because of the failure of respondents to adopt a cap factor lawfully." This case was subsequently transferred to the Superior Court, Wake County, by consent of the parties.

On 25 April 2017, the Board of Education moved for summary judgment in its favor. On 30 May 2017, the trial court entered an order granting summary judgment in favor of the Board of Education on the grounds that (1) "[t]he Board of Trustees' adoption of the cap factor in [N.C.]G.S. [§] 135-5(a3) is subject to rule making under the [Administrative Procedure Act]"; (2) "respondents' denial of petitioner's [r]equest for a [d]eclaratory [r]uling was in error as a matter of law"; and (3) "[t]he substantial rights of petitioner have been prejudiced by the respondents' decision." As a result, the trial court determined that the Board of Education was "entitled to have this Court declare that the Board of Trustees' adoption of the cap factor on October 23,

2014, and adoption of the new factor on October 22, 2015, are void and of no effect."[3] Respondents noted an appeal to the Court of Appeals from the trial court's order.

In seeking relief from the trial court's order before the Court of Appeals, respondents argued that the General Assembly had intended that the cap factor be adopted by the Board of Trustees by resolution, rather than by the use of Administrative Procedure Act-complaint rulemaking procedures. Respondents argued that the General Assembly had expressly delineated the functions that required the use of rulemaking procedures in Article 1, Chapter 135 of the General Statutes and that the list of functions contained in that chapter did not include the adoption of actuarial recommendations. In addition, respondents contended that the Administrative Procedure Act did not override the statutory provisions governing the operation of the Retirement System, which spell out specific administrative procedures that must be used in connection with the adoption of actuarial recommendations. Finally, respondents argued that the trial court had erred by failing to defer to the Retirement System's interpretation of the relevant statutory provisions and that the Retirement System had traditionally interpreted the relevant statutory provisions to allow for the adoption and approval of actuarial tables, rates,

---

[3] At a meeting held on 22 October 2015, the Board of Trustees discussed the establishment of a new cap factor. At that meeting, Mr. Langer and Mr. Ribble presented updated actuarial data. Based upon this data, the actuary proposed new assumptions and recommended a range of cap factors from 4.2 to 4.8. At the conclusion of the actuary's presentation, the Board of Trustees unanimously adopted a new cap factor of 4.5.

and assumptions by means of resolutions adopted by the Board of Trustees rather than through the promulgation of an Administrative Procedure Act-compliant rule.

In affirming the trial court's order, the Court of Appeals began by noting that respondents had not challenged the trial court's conclusion that "[t]he cap factor meets the [Administrative Procedure Act's] definition of a rule in that it is a regulation or standard adopted by the Board [of Trustees] . . . to implement [N.C.]G.S. [§] 135-5(a3)" and that respondents had, instead, argued that "[t]he General Assembly has distinguished functions that require rule[ ]making from functions that do not" and intended to exempt the cap factor determination from the coverage of the rulemaking provisions of the Administrative Procedure Act "by implication." *Cabarrus Cty. Bd. of Educ. v. Dep't of State Treasurer*, 821 S.E.2d 196, 201 (N.C. Ct. App. 2018). The Court of Appeals rejected this aspect of respondents' position on the grounds that the General Assembly had not explicitly exempted the operations of the Board of Trustees or the adoption of the cap factor from the rulemaking provisions of the Administrative Procedure Act, as it had done with respect to various other agencies and administrative actions in N.C.G.S. § 150B-1(c) and (d). *Id.* (citing *Vass v. Board of Trustees*, 324 N.C. 402, 408, 379 S.E.2d 26, 29 (1989) (stating that, "[h]ad the General Assembly intended that [the Board of Trustees of the Teachers' and State Employees' Comprehensive Major Medical Plan] be excluded from the requirements of the [Administrative Procedure] Act, we must assume that it would have inserted a specific provision in some statute expressly stating this intent" (citing *Lemons v. Old*

*Hickory Council*, 322 N.C. 271, 276–77, 367 S.E.2d 655, 658 (1988))); *N. Buncombe Ass'n of Concerned Citizens v. Rhodes*, 100 N.C. App. 24, 27–28, 394 S.E.2d 462, 465 (1990) (holding that "the trial court lacked subject matter jurisdiction . . . because the plaintiffs failed to exhaust their administrative remedies" under the Administrative Procedure Act given that the Department of Environment, Health, and Natural Resources "is not among those agencies which the [Administrative Procedure Act] specifically exempts from its provisions")).

In addition, the Court of Appeals declined to hold that the General Assembly had implicitly exempted the adoption of the cap factor from the ambit of the rulemaking provisions of the Administrative Procedure Act on the grounds that the only State agency whose operations had been deemed to be entitled to that status was the North Carolina State Bar. *Id.* at 203; *see also Bring v. N.C. State Bar*, 348 N.C. 655, 501 S.E.2d 907 (1998) (holding, by implication, that the rulemaking provisions of the Administrative Procedure Act do not apply to the State Bar); *N.C. State Bar v. Rogers*, 164 N.C. App. 648, 596 S.E.2d 337 (2004) (holding, by implication, that the adjudicatory provisions of the Administrative Procedure Act do not apply to the State Bar). In reaching this conclusion, the Court of Appeals noted that, in *Rogers*, it had "recognized that the General Assembly enacted a distinct, thorough, complete, and self-contained disciplinary process by which the State Bar—through the [Disciplinary Hearing Commission]—was mandated to initiate and pursue investigations and hearings as required to police and regulate attorney conduct" and that the existence

of this complete and self-contained process, which "include[d] procedural rules[,] . . . left no room for application of [Administrative Procedure Act] procedures." *Cabarrus Cty. Bd. of Educ.*, 821 S.E.2d at 205. Similarly, in addressing our decision in *Bring*, the Court of Appeals noted that "the organic statute at issue [in that case] . . . established a rule making procedure completely independent from that contained in the [Administrative Procedure Act,]" making it "clear that the specific rule making provisions enacted for proceedings governed by the State Bar controlled," especially given that the statutory provisions at issue in *Bring* contained "adequate procedural safeguards . . . to assure adherence to the legislative standards" and "a sufficient standard to guide the Board [of Law Examiners]" in exercising its rulemaking authority. *Id.* at 205–06 (quoting *Bring*, 348 N.C. at 659, 501 S.E.2d at 910). In view of the fact that Article 1, Chapter 135 of the General Statutes "includes nothing approaching the level of independent rule making mandated by the General Assembly for the State Bar," the Court of Appeals rejected respondents' contention that the applicability of the rulemaking procedures contained in the Administrative Procedure Act should be determined on a "line-by-line basis . . . by analyzing each individual sentence or clause of a statutory provision." *Id.* at 206 (emphasis omitted).

Furthermore, the Court of Appeals determined that "[t]he requirement that the actuary submit proposed cap factors to the Board [of Trustees] for adoption does not constitute a separate procedure for rule making purposes" sufficient to render the rulemaking provisions of the Administrative Procedure Act inapplicable. *Id.* at 207.

Instead, the Court of Appeals concluded that "[t]his requirement merely insures that the cap factor adopted by the Board [of Trustees] is based upon professionally determined assumptions and projections, and that there will be sufficient documentation to satisfy the requirements of Chapter 135, the [Administrative Procedure Act], and the State Budget Act." *Id*. at 207–08. After noting that Article 1, Chapter 135 of the General Statutes does not define the term "adopt" and that the Administrative Procedure Act explicitly defined that term as meaning "to take final action to create, amend, or repeal *a rule*," the Court of Appeals held that "the word 'adopt' in N.C.G.S. § 135-5(a3) has the same meaning" that it does when it is used in the Administrative Procedure Act. *Id*. at 208. The Court of Appeals further held that, "any time the word 'adopt' is used, it expressly and necessarily *requires an associated rule*," citing N.C.G.S. § 150B-2(1b) (2017). *Id*. Similarly, after noting that Article 1, Chapter 135 of the General Statutes does not define the term "rule," the Court of Appeals held that "the cap factor falls within the [Administrative Procedure Act's] definition of a 'rule' " and that the General Assembly did not intend to modify or amend the Administrative Procedure Act by implication at the time that it prescribed the procedures to be utilized in connection with the adoption of a cap factor. *Id*.

The Court of Appeals also rejected respondents' related arguments that the Board of Trustees "understood the cap factor to be an actuarial assumption or rate, or that it adopted the cap factor pursuant to the provisions of 20 N.C. Admin. Code

2B.0202," and that the Board of Trustees' interpretation of the relevant statutory provisions to this effect should be given deference. *Id.* at 209 (citing *Wells v. Consol. Judicial Ret. Sys. of N.C.*, 354 N.C. 313, 319, 553 S.E.2d 877, 881 (2001) (stating that "it is ultimately the duty of courts to construe administrative statutes" and that "courts cannot defer that responsibility to the agency charged with administering those statutes" (citing *State ex rel. Utils. Comm'n v. Pub. Staff*, 309 N.C. 195, 306 S.E.2d 435 (1983))). The Court of Appeals was not persuaded by respondents' arguments that subjecting the adoption of a cap factor to formal rulemaking requirements would result in "unnecessar[y] inefficien[cies]" and serve no useful purpose on the grounds that the Court of Appeals "is not the proper entity to address those arguments" and that the "[w]eighing . . . [of] public policy considerations is in the province of our General Assembly" instead. *Id.* at 209–10 (quoting *Wynn v. United Health Servs./Two Rivers Health-Trent Campus*, 214 N.C. App. 69, 79, 716 S.E.2d 373, 382 (2011)). As a result, for all of these reasons, the Court of Appeals affirmed the trial court's order. On 27 March 2019, this Court allowed respondents' petition for discretionary review of the Court of Appeals' decision.

In seeking to persuade this Court to reverse the Court of Appeals' decision, respondents begin by arguing that the General Assembly had stated in N.C.G.S. § 135-5(a3) that actuarial decisions need not be made through the use of Administrative Procedure Act-compliant rulemaking procedures and that, on the contrary, the Board of Trustees had the authority to follow N.C.G.S. § 135-6(*l*) in

making any required actuarial decisions. In support of this contention, respondents direct our attention to *Bring*, in which the Board of Law Examiners adopted a set of procedures for use in determining the identity of those persons eligible to take the bar examination and a list of law schools that had been approved by the American Bar Association that it presented to the State Bar Council and the Chief Justice for approval in reliance upon N.C.G.S. § 84-24 (providing that "[t]he Board of Law Examiners, subject to the approval of the [State Bar] Council shall by majority vote, from time to time, make, alter and amend such rules and regulations for admission to the [State] Bar as in their judgment shall promote the welfare of the State and the profession") despite the fact that nothing in the relevant statutory provisions explicitly displaced the Administrative Procedure Act. *Bring,* 348 N.C. at 657–60, 501 S.E.2d at 908–10. In determining that the statutorily established procedural requirements contained in Chapter 84 of the General Statutes superseded the rulemaking procedures required by the Administrative Procedure Act, this Court recognized that the Board of Law Examiners was an expert body with specialized knowledge that was better equipped to make decisions concerning the suitability of applicants to take the bar examination than the General Assembly. *Id.* at 659, 501 S.E.2d at 910. Similarly, respondents assert that the actuary in this case provided the Board of Trustees with an analysis of the relevant information and a recommendation pursuant to N.C.G.S. § 135-6(*l*) and that the Board of Trustees had accepted the information and recommendations provided by the actuary, recorded its

action in the meeting minutes, and begun implementing the cap factor. As a result, respondents contend that our decision in *Bring* necessitates a conclusion that the Board of Trustees was not required to utilize the rulemaking procedures specified in the Administrative Procedure Act in adopting the cap factor.

Secondly, respondents contend that the Court of Appeals erred by holding that specific procedural statutes, such as N.C.G.S. § 135-6(*l*), only supersede the rulemaking provisions of the Administrative Procedure Act in the event that they "left no room" for the application of those procedures, citing *High Rock Lake Partners, LLC v. N.C. Dep't of Transp.*, 366 N.C. 315, 322, 735 S.E.2d 300, 305 (2012) (stating that, "when two statutes arguably address the same issue, one in specific terms and the other generally, the specific statute controls" (citing *State ex rel. Utils. Comm'n v. Edmisten*, 291 N.C. 451, 465, 232 S.E.2d 184, 193 (1977))), and decisions from federal courts. As additional support for this contention, respondents assert that "the Court of Appeals allowed a generic statute to displace a specialized statute written for a specific kind of agency action" contrary to this Court's decision in *Nat'l Food Stores v. N.C. Bd. of Alcoholic Control*, 268 N.C. 624, 151 S.E.2d 582 (1966), in which we held that a specific statutory provision governing the sale of alcohol to minors superseded a more generic statutory provision when the two statutory provisions conflicted with each other. According to respondents, requiring the Board of Trustees to disregard N.C.G.S. § 135-6(*l*) in favor of the rulemaking provisions of the Administrative Procedure Act contravenes the General Assembly's intent, citing *LexisNexis Risk*

*Data Mgmt. Inc. v. N.C. Admin. Office of the Courts*, 368 N.C. 180, 187, 775 S.E.2d 651, 656 (2015), and *Lunsford v. Mills*, 367 N.C. 618, 623, 766 S.E.2d 297, 301 (2014). Respondents argue that "the rationale for applying the more specific statute is particularly strong when that statute was enacted after the generic one," citing *Nat'l Food Stores* (noting that the specific statute at issue in that case had been enacted ten years after the enactment of the general statute), as is the case in this instance given that the present Administrative Procedure Act rulemaking provisions were enacted in 1991, while N.C.G.S. § 135-6(*l*) was enacted in 2012. In addition, respondents contend that, contrary to the Court of Appeals' decision in this case, nothing requires that the specific statute be "distinct, thorough, complete, and self-contained" in order for it to implicitly supersede the Administrative Procedure Act, citing *Hughey v. Cloninger*, 297 N.C. 86, 89–92, 253 S.E.2d 898, 900–02 (1979), and *Piedmont Publ'g Co. v. City of Winston-Salem*, 334 N.C. 595, 434 S.E.2d 176 (1993), or that the specific statute be read *in pari materia* with the general statute, citing *High Rock Lake*, 366 N.C. at 320–22, 735 S.E.2d at 304–05. Simply put, respondents claim that the Court of Appeals' decision "cannot be reconciled with this Court's more-specific-statute jurisprudence," citing *High Rock Lake*, *Nat'l Food Stores*, and *Bring*, and that the logic upon which the Court of Appeals relied "would have produced the opposite result in *Bring*."

Furthermore, respondents contend that there is ample evidence indicating that the General Assembly did not intend that the cap factor be established using

Administrative Procedure Act-complaint rulemaking procedures. More specifically, respondents note that, while "the legislature explicitly required the [Board of T]rustees to use rulemaking to define how the [R]etirement [S]ystem will report to employers on probable cases of pension spiking[,] . . . the section of the session law that describes setting the cap factor makes no mention of rulemaking." Respondents assert that this "drafting pattern[,] . . . [which] use[s] . . . key words in one place but not elsewhere[,] bars an interpretation that injects the key words where the legislature has omitted them," citing *Fid. Bank v. N.C. Dep't of Rev.*, 370 N.C. 10, 21–22, 803 S.E.2d 142, 150 (2017) and *Morrison v. Sears, Roebuck & Co.*, 319 N.C. 298, 303, 354 S.E.2d 495, 498 (1987). Respondents argue that, while the use of Administrative Procedure Act-complaint rulemaking makes sense in some circumstances, such as complying with the reporting requirement discussed in N.C.G.S. § 135-8(f)(2)(f), it "offers no value" in the setting of a cap factor, "has no proper role in a process that mandates deference to an expert actuary," and "cannot be a matter of public debate" given the existence of a statutory requirement that the cap factor be recommended to the Board of Trustees by the actuary based upon actual experience, citing *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 3 (D.C. Cir. 2011) and N.C.G.S. § 135-5(a3). In addition, respondents contend that the lengthy rulemaking process required by the Administrative Procedure Act is incompatible with the relatively short timeline in which the Act had to be implemented—a mere twenty-two weeks pursuant to N.C.G.S. § 135-8(f)(2)(f). According to respondents, "the

legislature cannot have intended for the agency" to reach the "nonsensical result" of "miss[ing] the explicit deadlines stated in the law" and, instead, "intended the [R]etirement [S]ystem to act swiftly to address the funding cap caused by pension spiking" by acting in accordance with N.C.G.S. § 135-6(*l*), instead of complying with the rulemaking procedures set out in the Administrative Procedure Act.[4]

Respondents cite *Lunsford*, 367 N.C. at 623, 766 S.E.2d at 301, in support of their argument that, when viewed "as a whole[,] . . . [t]hose statutes confirm that the legislature has consciously chosen to exclude actuarial recommendations from the [Administrative Procedure Act's] rulemaking requirements." According to respondents, twenty-six statutory provisions, including all fourteen of the provisions relating to actuarial matters, simply state that the Board of Trustees must merely "adopt" or "establish" certain measures without making any mention of the obligation to utilize Administrative Procedure Act-complaint rulemaking. In addition, respondents note that ten of the twelve provisions that deal with non-actuarial matters explicitly require the use of Administrative Procedure Act-complaint rulemaking.

Finally, respondents contend that "[t]he cases cited by the Court of Appeals do not hold that the [Administrative Procedure Act's] general rulemaking procedures override specific procedures in an agency statute." According to respondents, this

---

[4] Respondents note that, when the Board of Trustees later adopted a cap factor utilizing the Administrative Procedure Act's rulemaking procedures, it took the agency 364 days to do so.

case is distinguishable from *Vass* given that that case was decided at a time when the Administrative Procedure Act "appl[ied] to every agency . . . except to the extent and in the particulars that any statute . . . makes specific provisions to the contrary[,]" *see* N.C.G.S. § 150B-1(c) (1987), formerly codified as N.C.G.S. § 150A-1(a), which respondents describe as an "exclusivity requirement for rulemaking[,]" with this language having been deleted in 1991 and with the "current [version of the Administrative Procedure Act] impos[ing] no parallel exclusivity provision for rulemaking." In addition, respondents distinguish this case from *Empire Power Co. v. N.C. Dep't of Env't, Health and Nat. Res.*, 337 N.C. 569, 447 S.E.2d 768 (1994) (holding that, in the event that an agency-specific statute and the Administrative Procedure Act can be read *in pari materia*, the Court "must give effect to both if possible"), which, in respondents' view, dealt exclusively with contested case provisions that are not at issue in this case and that "continue to be subject to the mandate that exemptions from the [Administrative Procedure Act] be express," citing N.C.G.S. § 150B-1(e). As a result, respondents argue that both *Empire Power* and *Bring* indicate that, "where the same question is answered by both the agency statute and the [Administrative Procedure Act], . . . the more-specific statute applies."

In seeking to persuade us to uphold the Court of Appeals' decision, the Board of Education argues that an exemption from the rulemaking provisions of the Administrative Procedure Act only exists in the event that the clear and unambiguous statutory language requires such a result. According to the Board of

Education, the General Assembly explicitly created such an exemption for certain enumerated agencies, such as the North Carolina Utilities Commission, and for certain enumerated administrative actions, such as executions conducted by the North Carolina Department of Public Safety. The Board of Education asserts that the General Assembly's failure to explicitly exempt the Retirement System from the rulemaking requirements of the Administrative Procedure Act is sufficient to establish the non-existence of such an exemption, citing *Vass*. In addition, the Board of Education denies that any implied exemption from the rulemaking provisions of the Administrative Procedure Act exists in this situation. Although several attempts have been made in the General Assembly to obtain the enactment of legislation exempting the establishment of a cap factor from the rulemaking provisions contained in the Administrative Procedure Act, none of those efforts have been successful. Moreover, the existence of such proposed legislation shows that, in the event that the General Assembly wished to exempt the process of establishing a cap factor from the rulemaking provisions of the Administrative Procedure Act, it knows how to do so.

The Board of Education asserts that the facts of this case are distinguishable from those at issue in *Bring* and *Rogers*. According to the Board of Education, both *Bring* and *Rogers* recognize that the General Assembly had enacted a comprehensive set of statutes governing the operations of the State Bar that were clearly intended to supersede the relevant provisions of the Administrative Procedure Act. On the

other hand, the Board of Education contends that the same cannot be said for the statutes at issue in this case so that respondents are, in this instance, "asking the [C]ourt . . . to conjure an exemption out of vague statutes and a history that contradicts their explanation."

In the Board of Education's view, the legal principle that a specific statute does not supersede the provisions of the Administrative Procedure Act unless it leaves "no room for application of [Administrative Procedure Act-compliant rulemaking] procedures" does not represent the adoption of a new, more stringent legal standard; instead, the language to this effect utilized by the Court of Appeals is "simply a description of the facts in the *Rogers* case." Similarly, the Board of Education contends that respondents have mischaracterized this Court's decision in *Empire Power*, which, in its view, clearly indicates that the goal of the 1991 amendments to the Administrative Procedure Act, instead of "leav[ing] room for more exemptions," was "to further uniformity" in administrative rulemaking in accordance with the Administrative Procedure Act and to reduce the number of exempt agencies.

The Board of Education argues that, contrary to respondents' assertions, N.C.G.S. § 135-6(*l*) "does not address rulemaking" and "includes no specific provision at all comparable to what the [C]ourt considered in *Empire Power*." In addition, the Board of Education notes that respondents have not identified any "retirement statute that offers the same kind of explicit conflict with the [Administrative Procedure Act] as in *Empire Power*." The Board of Education points out that, prior

to the initiation of this proceeding, respondents had not treated statutes requiring the Board of Trustees to "adopt" certain measures—including the statute at issue in this case—differently from statutes requiring the Board of Trustees to "adopt a rule" in order to address certain issues and asserts that "[i]t defies credibility for [respondents] to now argue that [they] understood all along a difference based on the use of 'adopt a rule' rather than 'adopt.' " The Board of Education cites a number of retirement statutes that make reference to rulemaking even though the Board of Trustees has never adopted the rules called for by those statutory provisions. On the other hand, the Board of Education cites statutes which would not, in respondents' view, require the use of the rulemaking procedures pursuant to the Administrative Procedure Act, in which rules have been adopted. As a result, the Board of Education contends that respondents have failed to distinguish between statutory provisions requiring them to "adopt" or "adopt a rule" in a meaningfully consistent manner.

According to the Board of Education, the fact that a cap factor must be based upon the actuary's recommendation does not compel a determination that the decision to establish a particular cap factor is controlled by N.C.G.S. § 135-6(*l*) or renders the rulemaking provisions of the Administrative Procedure Act inapplicable. In the Board of Education's view, "[w]hile the cap factor chosen by the Board of Trustees must be based on actuarial assumptions, it is not an actuarial assumption itself." On the contrary, the Board of Education describes the adoption of a cap factor as a "discretionary decision that results from consideration of the actuarial

assumptions presented by the [R]etirement [S]ystem's actuary" and states that "[N.C.]G.S. [§] 135-6(*l*) requires the . . . [Board of T]rustees to include actuarial assumptions in the state retirement plan to satisfy the [Internal Revenue Service's] requirement that the employer not be able to alter the defined benefits to retirees." In essence, the Board of Education asserts that a cap factor "is of a different character than the tables, rates, and assumptions" governed by the Board of Trustees' rule concerning actuarial assumptions, citing 20 N.C. Admin. Code 2B.0202, and that the record is devoid of any indication that the Board of Trustees "ever considered the cap factor to be an actuarial assumption." As a result, the Board of Education argues that the mere fact that the actuary makes a recommendation concerning the cap factor to the Board of Trustees does not exempt the Retirement System from the rulemaking requirements of the Administrative Procedure Act, with "[t]here [being] nothing remarkable . . . about the use of such expertise in rulemaking."

The Board of Education contends that the Board of Trustees could have satisfied the five-month time frame within which it was required to establish a cap factor by adopting a temporary rule pursuant to N.C.G.S. § 150B-21.1. Although the statutory deadline for setting the cap factor was 1 January 2015, the Board of Education notes that no rulemaking proceeding was initiated until December 2017 and that no cap factor rule became effective until 21 March 2019. Even so, the Board of Education points out that the Retirement System sent numerous notices to the employers of affected retirees for the purpose of "seeking additional contributions . . .

for retirements that occurred well before 21 March 2019," including the notice sent in this case, and that, when employers objected to the resulting invoices, the Retirement System "replied that it consider[ed] the new rule applicable to all retirements since 1 January 2015." For that reason, the Board of Education asserts that "[i]t would seem . . . that the [R]etirement [S]ystem [did] not really believe the 1 January 2015 effective date of the pension cap law established a deadline for rulemaking that could not be met."

Finally, the Board of Education contends that the significant public interests at stake in the establishment of the cap factor make it "exactly the kind of important administrative decision that should go through rulemaking." In support of this assertion, the Board of Education directs our attention to the "devastating sums of money" that school systems have been billed following the retirement of eligible employees, which the Board of Education describes as "liabilities the school boards were powerless to avoid" given that "the pension cap law applied to contracts and compensation decisions that had been entered [into] years before and that could not have been changed in response to the new law." In addition, the Board of Education notes that, when the Board of Trustees proposes a rule that will have a "substantial economic impact," which any rule prescribing a cap factor will necessarily have, the Administrative Procedure Act requires the agency to consider at least two alternatives and perform a fiscal analysis. *See* N.C.G.S. § 150B-19.1(f). According to the Board of Education, the use of the rulemaking procedures required by the

Administrative Procedure Act would have the effect of "remind[ing the Board of Trustees] that the school board has no taxing authority," that the Board of Trustees would learn that local boards of education "would have to seek additional funding from the county commissioners," and that the Board of Trustees would be informed about "the number of teaching positions likely to be lost, the huge hole that would be created in capital funding, and the other consequences of their rulemaking" through the use of Administrative Procedure Act-compliant rulemaking to establish the cap factor.

According to well-established North Carolina law, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). An appellate court reviews a trial court's decision to grant or deny a motion for summary judgment de novo. *Meinck v. City of Gastonia*, 371 N.C. 497, 502, 819 S.E.2d 353, 357 (2018). We will now resolve the issue that has been presented for our consideration in this case in light of the applicable standard of review.

The sole issue for our consideration in this case is whether the General Assembly intended to relieve the Board of Trustees from the necessity for compliance with the rulemaking provisions contained in the Administrative Procedure Act in adopting a cap factor pursuant to N.C.G.S. § 135-5(a3). In view of the fact that

respondents have not denied that the establishment of a cap factor falls within the scope of the Administrative Procedure Act's definition of a "rule" and the fact that respondents acknowledge that the Board of Trustees is not explicitly exempt from the Administrative Procedure Act, the ultimate issue before us in this case is whether the establishment of a cap factor is implicitly exempt from the Administrative Procedure Act's rulemaking provisions. A careful analysis of our prior decisions concerning the extent to which particular agencies or decisions are deemed to be implicitly exempt from the necessity for compliance with the provisions of the Administrative Procedure Act makes it clear that such implicit exemptions are very much the exception, rather than the rule, and should only be recognized in the event that it is abundantly clear that the General Assembly intended such a result.

This Court's decision in *Empire Power* stemmed from a challenge by a property owner to a state agency's decision to award an air emissions permit to a utility company. *Empire Power Co.*, 337 N.C. at 574, 447 S.E.2d at 771–72. The property owner alleged that he would suffer injury to his health by virtue of the emissions that would result from the issuance of the permit. *Id.* The state agency contended, and the Court of Appeals agreed, that, pursuant to N.C.G.S. § 143-215.108(e), the right to challenge such permitting decisions was limited to the applicant. *Id*. at 573–74, 447 S.E.2d at 771. In considering whether the "organic statute amends, repeals, or makes an exception to the [Administrative Procedure Act,] so as to exclude [the property owner] from those entitled to" challenge the agency's permitting decision, we noted

that (1) "the primary function of a court is to ensure that the purpose of the [l]egislature in enacting the law . . . is accomplished"; (2) "statutes *in pari materia*, and all parts thereof, should be construed together" and "reconciled with each other when possible"; and (3) "any irreconcilable ambiguity should be resolved so as to effectuate the true legislative intent." *Id.* at 591, 447 S.E.2d at 781 (quoting *Comm'r of Ins. v. Rate Bureau*, 300 N.C. 381, 399–400, 269 S.E.2d 547, 561 (1980) (citation omitted), *overruled on other grounds by In re Redmond*, 369 N.C. 490, 497, 797 S.E.2d 275, 280 (2017)). In addition, we stated that "implied amendments cannot arise merely out of supposed legislative intent in no way expressed, however necessary or proper it may seem to be," and that "[a]n intent to amend a statute will not be imputed to the legislature unless such intention is manifestly clear from the context of the legislation." *Id.* at 591, 447 S.E.2d at 781 (quoting *In re Halifax Paper Co.*, 259 N.C. 589, 594, 131 S.E.2d 441, 445 (1963)). We also held that an implied exemption to the relevant statutory provision will only be recognized "where the terms of a later statute are so repugnant to an earlier statute that they cannot stand together." *Id.* As long as there is "a fair and reasonable construction of the organic statute that harmonizes it with the provisions of the [Administrative Procedure Act,] . . . it is our duty to adopt that construction." *Id.* at 593, 447 S.E.2d at 782 (citing *In re Miller*, 243 N.C. 509, 514, 91 S.E.2d 241, 245 (1956)). In view of the fact that the General Assembly "ha[d] not expressed or otherwise made manifestly clear an intent to [supplant the Administrative Procedure Act]" in the "organic" statute at issue in

*Empire Power* and the fact that there was not "such repugnancy between the statutes [at issue in that case] as to create an implication of amendment or repeal 'to which we can consistently give effect under the rules of construction of statutes,'" we declined to recognize the existence of an implied exemption from the judicial review provisions of the Administrative Procedure Act sufficient to bar the landowner from seeking review of the challenged agency action. *Id.*

Similarly, *Bring* involved a challenge by an individual who had graduated from a law school that had not been approved for accreditation pursuant to N.C.G.S. § 84-24. In rejecting the individual's argument that the Board of Law Examiners was not required to have identified the law schools whose graduates were eligible to take the North Carolina bar examination, we stated, without further elaboration, that N.C.G.S. § 84-21 "[gave] specific directions as to how the Board [of Law Examiners] should adopt rules." *Id.* at 660, 501 S.E.2d at 910. As a result, we held that the existence of a specific statute prescribing the manner in which the Board of Law Examiners was required to adopt rules sufficed to render the rulemaking provisions of the Administrative Procedure Act inapplicable. *Id.* at 659, 501 S.E.2d at 910.

In *Vass*, an individual insured under a state medical plan filed an unsuccessful claim seeking the recovery of costs associated with laser vision correction surgery. *Vass*, 324 N.C. at 403–04, 379 S.E.2d at 27. Although the individual appealed to the medical plan's Board of Trustees, that body rejected his appeal on the grounds that the surgical procedure in question was not covered pursuant to N.C.G.S. § 135-

40.6(6)(h) at that time. *Id*. In determining whether the individual's ability to seek further review of the Board of Trustees' decision was limited by N.C.G.S. § 135-39.7, which provided that the Board of Trustees had the authority to "make a binding decision on the matter in accordance with procedures established by the Executive Administrator and Board of Trustees," we noted that, at the time, the Administrative Procedure Act "clearly indicate[d]" that it "shall apply to every agency of the executive branch of State government, except to the extent and in the particulars that any statute 'makes *specific* provisions to the contrary,' " *id*. at 406, 379 S.E.2d at 28 (quoting N.C.G.S. § 150B-1(c) (1987), previously codified as N.C.G.S. § 150A-1(a)), and that "[i]t is clear that the General Assembly intended only those agencies it expressly and unequivocally exempted from the provisions of the Administrative Procedure Act be excused in any way from the Act's requirements," with even such specific exemptions to "apply only to the extent specified by the General Assembly." *Id*. at 407, 379 S.E.2d at 29. In considering whether N.C.G.S. § 135-39.7 exempted the Board of Trustees' decision from further review pursuant to the Administrative Procedure Act, we noted that "the General Assembly has shown itself to be quite capable of specifically and expressly naming the particular agencies to be exempt from the provisions of the Act" and that the Board of Trustees had never "been expressly exempted from the Act's requirements." *Id*. As a result, "we conclude[d] that the [Board of Trustees'] decisions [were] subject to administrative review under the [Administrative Procedure Act]," stating that, "[h]ad the General Assembly

intended that the [Board of Trustees] be excluded from the requirements of the [Administrative Procedure Act], we must assume that it would have inserted a specific provision in some statute expressly stating this intent." *Id.* at 407–08, 379 S.E.2d at 29 (citation omitted).

A collective analysis of these decisions, which encompass a range of different issues and varying present and now-repealed statutory provisions, demonstrates that this Court has consistently refused to recognize the existence of any implicit exemption from the provisions of the Administrative Procedure Act in the absence of a clearly-stated legislative intent to the contrary. A presumption that the rulemaking provisions of the Administrative Procedure Act apply to the formulation of rules, as that term is defined in N.C.G.S. § 150B-2(8a), in the absence of an explicit or implicit exemption, is fully consistent with the applicable statutory provisions and represents the most logical reading of them. *See* N.C.G.S. § 150B-1(a) (providing that "[t]his Chapter establishes a uniform system of administrative rule making and adjudicatory procedures for agencies"); N.C.G.S. § 150B-18 (providing that "[t]his Article applies to an agency's exercise of its authority to adopt a rule[,]" with "[a] rule [not being] valid unless it is adopted in substantial compliance with this Article"). For the following reasons, we are not persuaded that the General Assembly, in enacting the anti-pension-spiking legislation that is at issue in this case, intended to implicitly exempt the Board of Trustees from complying with the rulemaking provisions of the Administrative Procedure Act when establishing a cap factor.

As an initial matter, we are unable to conclude that N.C.G.S. § 135-5(a3) and N.C.G.S. § 135-6(*l*) are "so repugnant to [the Administrative Procedure Act] that they cannot stand together." *Empire Power Co.*, 337 N.C. at 591, 447 S.E.2d at 781 (quoting *In re Halifax Paper Co.*, 259 N.C. at 594, 131 S.E.2d at 445). On the contrary, we have no difficulty in concluding that the relevant statutory provisions can be harmonized with the rulemaking requirements of the Administrative Procedure Act with relative ease. Simply put, we do not see anything in N.C.G.S. § 135-5(a3) or N.C.G.S. § 135-6(*l*) that suggests that the General Assembly intended to dispense with the necessity for compliance with the relevant provisions of the Administrative Procedure Act in establishing a cap factor.

A careful analysis of the relevant statutory provisions makes it clear that the adoption of a cap factor is not a ministerial act in which the Board of Trustees does nothing more than ratify the actuary's recommendation. According to N.C.G.S. § 135-5(a3), the Board of Trustees is required to "adopt a contribution-based benefit cap factor recommended by the actuary, based upon actual experience, such that no more than three-quarters of one percent (0.75%) of retirement allowances are expected to be capped." Although the remaining provisions of N.C.G.S. § 135-5(a3) prescribe, in considerable detail, what use is to be made of the cap factor once it has been adopted, the relevant statutory provisions do not prescribe any additional procedural steps that must be taken in connection with the adoption of the cap factor. In view of the fact that the actuary serves as "the technical adviser of the Board of Trustees on

matters regarding the operation of the funds created by the provisions of this Chapter" and the fact that the cap factor is a substantive decision to be made by the Board of Trustees, rather than an "assumption[ ] used by the [Retirement System's] actuary," N.C.G.S. § 135-6(*l*), we are not persuaded that the cap factor is an actuarial assumption or that the Board of Trustees is required to simply rubber stamp the actuary's cap factor recommendation.[5] On the contrary, as is evidenced by the fact that the adopted cap factor cannot result in more than "three-quarters of one percent (0.75%) of retirement allowances being capped," N.C.G.S. § 135-5(a3), it is clear that the Board does, in fact, have a degree of discretion in determining an appropriate cap factor within the confines of the stated statutory parameters. In addition, the fact that an actuary must be involved in the process of establishing the cap factor does not suffice to provide affected persons with the sort of procedural protections that are inherent in Administrative Procedure Act-compliant rulemaking proceedings, obviate the importance of public input into the adoption of a cap factor, or reduce the importance of the additional analytical steps that administrative agencies must take in making decisions of the apparent magnitude of this one. *See*, e.g., N.C.G.S. § 150B-

---

[5] Although the interpretation of the relevant statutory language adopted by an administrative agency is entitled to "great weight," *Frye Reg'l Med. Ctr. v. Hunt*, 350 N.C. 39, 45, 510 S.E.2d 159, 163 (1999) (citing *High Rock Lake Ass'n v. N.C. Envtl. Mgmt. Comm'n*, 51 N.C. App. 275, 279, 276 S.E.2d 472, 475 (1981)), we are not persuaded by respondents' interpretation of the relevant statutory provisions or satisfied that such a rule of construction has substantial bearing in situations in which an agency is seeking to avoid the constraints that would otherwise be imposed by the Administrative Procedure Act.

21.4(b1)–(b2) (requiring that, where the aggregate financial impact of an administrative agency decision upon all affected persons exceeds $1 million during a twelve-month period, the agency must generate a fiscal note describing, among other things, "at least two alternatives to the proposed rule that were considered by the agency and the reason the alternatives were rejected")[6].  As a result, we conclude that the procedural requirements detailed in N.C.G.S. § 135-5(a3) and N.C.G.S. § 135-6(*l*), are not, unlike those at issue in *Bring*, sufficiently detailed to suggest that the General Assembly intended for the establishment of the cap factor to be implicitly exempt from the rulemaking provisions of the Administrative Procedure Act and we believe, instead, that the relevant statutory language contemplates that the cap factor will be established in a manner similar to that required when other administrative agencies are required to make discretionary decisions that are informed by agency staff expertise, as is the case with many, if not virtually all, administrative decisions.[7]

---

[6] The fact that N.C.G.S. § 135-5(a3) prohibits the Board of Trustees from adopting a cap factor that results in more than "three-quarters of one percent (0.75%) of retirement allowances being capped" necessarily means that a range of cap factors are statutorily permissible, making it perfectly sensible for the agency to be required to consider multiple alternatives.

[7] The descriptions of the cap factor decisions actually made by the Board of Trustees are fully consistent with the understanding set out in the text of this opinion.  For example, at the time that the initial cap factor was established in 2014, the actuary, after recommending the adoption of a 4.8 cap factor, stated that, "[f]or the reasons previously stated, the Board [of Trustees] may consider a more conservative factor[.]"  Similarly, at the time that the Board of Trustees established a new cap factor in the following year, the actuary

Although respondents suggest that the fact that the relevant statutory provisions use the term "adopt," rather than the expression "adopt a rule," indicates the existence of a clear distinction between circumstances in which Administrative Procedure Act-compliant rulemaking is required and those in which it is not, we conclude that this argument rests upon an exceedingly nuanced semantic distinction that does not appear to reflect the Board's actual practice. In addition, we are not persuaded that the distinction that respondents seek to draw between provisions couched in terms of "adopt," rather than "adopt a rule," is sufficient to overcome the presumption against the recognition of implicit exemptions from the requirements of the Administrative Procedure Act that is inherent in the relevant statutory provisions and this Court's practice of reading allegedly conflicting statutes in harmony whenever it is possible to do so. *Id.* at 593, 447 S.E.2d at 782 (citing *In re Halifax Paper Co.*, 259 N.C. at 595, 131 S.E.2d at 445; and *In re Miller*, 243 N.C. at 514, 91 S.E.2d at 245).

In addition, we are not convinced that the prior decisions of this Court upon which respondents rely provide significant support for the decision that they ask us to make. For example, we are not persuaded that our decision in *Fidelity Bank*, in which we held that an undefined term in the relevant statutory provision should be

---

stated that "the Board [of Trustees] may consider decreasing the factor[,]" that "the current factor [for the Teachers' and State Employees' Retirement System] is 4.8[,]" and that "the minimum allowable factor is 4.2[.]" As a result, the establishment of a cap factor does, in fact, involve the making of a discretionary decision that allows for the consideration of information other than purely actuarial considerations.

interpreted in accordance with its plain meaning and that, in the event that the General Assembly intended for the term in question to be used in a certain manner, it could have included such a definition in the relevant legislation, *see Fid. Bank*, 370 N.C. at 20, 803 S.E.2d at 149, provides any support for respondents' position given that respondents give the term "adopt" a somewhat technical meaning that lacks support in the remaining statutory language. In addition, our decision in *High Rock Lake Partners, LLC,* 366 N.C. at 322, 735 S.E.2d at 305, which rests upon the fact that the relevant statutory language was "clear and unambiguous," is of little moment in this case, given our belief that the relevant statutory provisions clearly do not exempt the establishment of the cap factor from the rulemaking provisions of the Administrative Procedure Act.

Similarly, our decision in *Hughey*, 297 N.C. at 92, 253 S.E.2d at 902, in which we held that a specific statute allowing the State Board of Education to disburse funds to severely learning disabled children superseded a more general statutory provision allowing county commissioners to disburse funds to the "physically or mentally handicapped," does not support respondents' position given that *Hughey* rested, at least in part, upon the fact that "the General Assembly has consistently delegated specific responsibility for the special education of learning disabled children to the State and local boards of education." Nothing in the present record suggests that the General Assembly has consistently exempted decisions by the

Board of Trustees of a similar magnitude as the establishment of the cap factor from the rulemaking provisions of the Administrative Procedure Act.

In *Nat'l Food Stores*, which involved statutes governing the sale of alcohol to minors, our determination that a specific statute must be given effect over a more general statute hinged upon the fact that the relevant statutes directly conflicted with each other, with the specific statute requiring that the seller know that the buyer was a minor while the general statute contained no such knowledge requirement. 268 N.C. at 629, 151 S.E.2d at 586. In the same vein, we held in *Piedmont Publ'g Co.* that a specific statute prevailed over a general statute because any attempt to read the two in harmony with each other would produce an "illogical" result. 334 N.C. at 597, 434 S.E.2d at 177. For the reasons set forth in more detail above we do not see the sort of conflict present in these decisions in analyzing the rulemaking provisions of the Administrative Procedure Act, on the one hand, and N.C.G.S. § 135-5(a3) and N.C.G.S. § 6(*l*), on the other.

Finally, unlike the situation at issue in *Bring*, the statutory provisions upon which respondents rely in support of their argument for an implicit exemption lack the sort of substantive and procedural safeguards that are present in the rulemaking provisions of the Administrative Procedure Act. 348 N.C. at 659, 501 S.E.2d at 910. Instead, N.C.G.S. § 135-5(3a) and N.C.G.S. § 135-6(*l*) are devoid of the sort of procedural detail that persuaded us to recognize an implicit exemption from the

rulemaking provisions of the Administrative Procedure Act in *Bring*. As a result, we are not persuaded by respondents' arguments in reliance upon our precedents.

Finally, we agree with the Board of Education that the public interests at stake in this case support, rather than undercut, the Board of Education's contention that the cap factor should be established by using the rulemaking provisions of the Administrative Procedure Act, which ensure the opportunity for adequate public input before a decision becomes final. As we have already demonstrated, the relevant statutory language clearly indicates that the establishment of a cap factor is a discretionary decision that must be made by the Board of Trustees, with the aid of an actuary, rather than a ministerial decision over which the Board of Trustees has little to no control. Moreover, as the Board of Education correctly notes, the relatively tight deadline within which the Board of Trustees was required to adopt an initial cap factor is entitled to very little weight in our analysis given that the Administrative Procedure Act allows for the adoption of temporary rules in the event that an agency is required to act while subject to significant time constraints. *See* N.C.G.S. § 150B-21.1(a)(2) (stating that "[a]n agency may adopt a temporary rule when it finds that adherence to the notice and hearing requirements of [N.C.]G.S. [§] 150B-21.2 would be contrary to the public interest and that the immediate adoption of the rule is required by . . . [t]he effective date of a recent act of the General Assembly"). Lastly, while the General Assembly is, of course, the ultimate arbiter of whether the adoption of a cap factor is implicitly exempt from the rulemaking provisions spelled out in the

Administrative Procedure Act, the relevant statutory language, read in light of this Court's decisions construing the language of other statutes to determine if they supplanted the requirements of the Administrative Procedure Act, satisfies us that the General Assembly did not intend such a result. Thus, for all of these reasons, we agree with the Court of Appeals that the Board of Trustees was required to adopt the statutorily mandated cap factor utilizing the rulemaking procedures required by the Administrative Procedure Act and that the Retirement System erred by billing the Cabarrus County Board of Education an additional amount relating to Dr. Shepherd's pension, in light of the Board of Trustees' failure to adopt the necessary cap factor in an appropriate manner. As a result, the Court of Appeals' decision in this case is affirmed.[8]

AFFIRMED.

---

[8] Although the Retirement System ultimately adopted a cap factor using the rulemaking procedures specified in the Administrative Procedure Act, we do not believe that this fact renders this case moot, given that the Board of Education has sought to have the additional amount that it paid to have Dr. Sheppard's pension refunded.

Justice NEWBY dissenting.

In 2014 the General Assembly addressed an imminent threat to the solvency of the entire State Retirement System: pension spiking. When it passed the pertinent anti-pension spiking provision, it required the Board of Trustees of the State Retirement System (the Board) to adopt a "cap factor" recommended by an actuary, and specifically described the procedures the Board must follow. That law was enacted against the backdrop that, since at least 1981, the Board has adopted actuarial recommendations by resolution. The Board expeditiously proceeded according to this process. Now the majority creates a five-year gap in this law's enforcement by holding that the procedures under the Administrative Procedure Act (APA) should apply. If, however, separate statutory provisions specifically describe the relevant agency's procedures, those provisions supersede those of the APA. In this case the General Assembly has given detailed directions to the Board on how to adopt and implement regulations to limit pension spiking. The legislature determined that quick action by the Retirement System was necessary to keep the retirement fund solvent. Because I believe the majority mistakenly requires the Board to submit to the APA's rulemaking procedures when it adopts a cap factor, I respectfully dissent.

The Retirement System is funded by contributions by state employers and employees over the course of the employment. Under state law, a state employee's pension upon retirement is calculated based on the average salary the employee earns

during the employee's four highest paying years of employment. It became evident that for a retiree who, for the last four years of employment, earned significantly higher salaries than in previous years, the calculated pension value was strikingly high compared to the amount contributed into the fund on the retiree's behalf. This practice was labeled "pension spiking." Pension spiking usually involves either early retirements or late-career pay raises that inflate the calculated pension amount. In the aggregate, pension spiking creates a dangerous deficit in the state retirement fund.

Seeing this threat to the solvency of the Retirement System, the General Assembly passed a law to limit pension spiking. An Act to Enact Anti-Pension-Spiking Legislation by Establishing a Contribution-Based Benefit Cap, S.L. 2014-88, § 1, 2014 N.C. Sess. Laws 291, 291–94. Under this law, which applies only to retirees who earned at least $100,000 per year during their four years of highest pay, the retiree's last employer must contribute additional funds into the Retirement System if the retiree's pension value significantly exceeds the annuitized value of the amount contributed on the retiree's behalf. N.C.G.S. § 135-5(a3) (2019). The employer must contribute additional funds if the ratio of the pension to the contributions exceeds the "cap factor." The cap factor is a ratio set by the Board. *Id.* Subsection 135-5(a3) specifically explains how a cap factor is to be set—an expert actuary must recommend the factor, and the cap factor must be of a value such that no more than three-quarters of one percent (0.75%) of retirees' plans will be capped by it. *Id.* Once the actuary

recommends a cap factor, the provision states that the Board "shall adopt" it. *Id.* A plain reading of that provision shows that the Board has no discretion on this point; it must adopt the cap factor recommended by the actuary. The text of the Act provided that it would go into effect less than six months after its passage. An Act to Enact Anti-Pension-Spiking Legislation by Establishing a Contribution-Based Benefit Cap, S.L. 2014-88, § 1, 2014 N.C. Sess. Laws 291, 291–94. The General Assembly thus signaled in at least two ways that a cap factor should be established quickly: (1) by giving detailed instructions for how the Retirement System must adopt a cap factor to address the problem and (2) by leaving a relatively short amount of time until the Act took effect.

The General Assembly has directed the Board to generally address actuarial calculations by accepting all documentation supporting actuarial recommendations and recording all such relevant information in its meeting minutes. N.C.G.S. § 135-6(l) (2019). In accordance with this statutory directive, it has been the Board's policy at least since 1981 to adopt actuarial recommendations by resolution and publication in meeting minutes, not by formal rulemaking procedures. 20 N.C. Admin. Code 2B.0202(a) (1981). In this case the Board followed these longstanding procedures and adopted a cap factor recommended by the actuary in compliance with subsection 135-5(a3).

Despite the detailed instructions the General Assembly gave the Board regarding the adoption of cap factors, the majority holds that the APA's rulemaking

procedures, which require public notice and comment, also bind how the Board adopts cap factors. By doing so, it fails to properly apply the longstanding principle of statutory construction that the intent of the General Assembly controls. In accordance with legislative intent, the recent more specific statute relevant to the case should apply instead of the earlier more general statute; but the majority avoids this principle. It also ignores the appropriate consideration of the agency's longstanding practice regarding specialized and technical issues like the one in this case. The majority misses this straightforward analysis because it wrongly mines from dated case law a presumption that the APA's procedures should apply to all agency actions.

"The principal goal of statutory construction is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (citing *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (1998)). "The best indicia of that intent are the language of the statute[,] . . . the spirit of the act[,] and what the act seeks to accomplish." *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) (citation omitted). In this case all of those indicia support the Board's adoption of cap factors by resolution instead of by the APA's rulemaking procedures. The statutory language directs that the Board "shall adopt" the cap factor recommended by the actuary; the General Assembly intended that the Board follow the specific procedures it provided, and nothing more. The General Assembly has given precise guidelines to the

Retirement System directly, choosing a cap factor is extremely technical and requires unique expertise, and the Board historically has adopted actuarial recommendations through resolution and publication, not through formal rulemaking.

The Retirement System should be allowed to use its own specialized procedures because the statute governing the adoption of a cap factor is more specific than the relevant provisions of the APA. When two statutes address the same subject matter, the more specific statute controls—the statute that more directly addresses the activity in question. *See Nat'l Food Stores v. N.C. Bd. of Alcoholic Control*, 268 N.C. 624, 629 151 S.E.2d 582, 586 (1966). In *Bring v. N.C. State Bar*, this Court considered whether the North Carolina State Bar Council, in promulgating a rule, had to follow the APA's rulemaking procedures or whether it could use the procedures described in the statute governing the Board of Law Examiners. 348 N.C. 655, 659–60, 501 S.E.2d 907, 910 (1998). That statute provided that the Board of Law Examiners could make rules and regulations related to State Bar admission as long as the State Bar Council gave approval. *Id.* at 657, 501 S.E.2d at 908. This Court held that "[i]t was not necessary to adopt the rule in accordance with the requirements of the APA," because the statute that created the Board of Law Examiners "gives specific directions as to how the Board shall adopt rules. These directions must govern over the general rule-making provision of the APA." *Id.* at 660, 501 S.E.2d at 910.

Here, like in *Bring*, the relevant statute is more specific than the APA. It specifically governs the adoption of cap factors by the Board. Though the APA

generally requires an opportunity for public notice and comment before an agency enacts a rule, *see* N.C.G.S. § 150B-21.2 (2017), subsection 135-5(a3) specifically provides that the Board "shall adopt a contribution-based benefit cap factor recommended by the actuary, based upon actual experience, such that no more than three-quarters of one percent (0.75%) of retirement allowances are expected to be capped." N.C.G.S. § 135-5(a3). The statute then goes into even more detail on how the cap factor must be used to determine certain pension payments. *Id.*

The best reading of this statute, alongside the APA, is that, even though the APA's procedural requirements might generally apply to rules made by the Retirement System, when adopting a cap factor the Board should follow the specific path of subsection 135-5(a3). This reading complies with the specific-general canon of statutory construction and gives reasonable effect to both the APA and subsection 135-5(a3).

The majority's position, however, fails to give full effect to subsection 135-5(a3). That provision requires that the Board adopt the cap factor recommended by the actuary and mandates that the cap factor must cap no more than three quarters of one percent of retirement allowances. N.C.G.S. § 135-5(a3). An additional requirement of public notice and comment could pressure the Board to ignore the specific guidelines of subsection 135-5(a3). If the actuary recommends a certain cap factor that complies with the "three-quarters-of-one-percent" ceiling but, during the public notice and comment portion of the proceedings, the public presents evidence

in favor of a different cap factor, what is the Board to do? Under subsection 135-5(a3), the Board should choose the cap factor recommended by the actuary. But, under the APA, the Board must give due consideration to the cap factor that the commenting public recommended. The Board could not adequately do both.[1] Quintessentially here, the more specific statute should control over the more general one. *See Nat'l Food Stores*, 268 N.C. at 629, 151 S.E.2d at 586 (explaining that, when multiple statutes that would apply to a set of facts cannot be reconciled, the more specific statute should control, especially when the more specific statute was enacted later in time).

The statutory analysis should control this case. When interpreting the APA and subsection 135-5(a3) on their own terms and in light of one another, it is clear that the Board need not follow the APA's rulemaking procedures. That conclusion should be the end of the matter. Still, multiple other reasons exist to properly consider the agency's interpretation.

We should respect the Board's procedures under subsection 135-5(a3) because the determination of a cap factor requires special and technical expertise. This Court

---

[1] Moreover, as the majority notes, the APA "require[es] that, where the aggregate financial impact of an administrative agency decision upon all affected persons exceeds $1 million during a twelve-month period, the agency must generate a fiscal note describing, among other things, 'at least two alternatives to the proposed rule that were considered by the agency and the reason the alternatives were rejected,' " citing N.C.G.S. §§ 150B-21.4(b1)–(b2). I do not see how the Board could adopt only the cap factor recommended by the actuary, but also meaningfully consider at least two other alternatives. These provisions of the APA do not make sense when applied to the process of adopting cap factors.

respects an agency's interpretation of a statute when the agency decisionmakers have special expertise in the area covered by the statute. *Wells v. Consol. Judicial Ret. Sys. of N.C.*, 354 N.C. 313, 320, 553 S.E.2d 877, 881 (2001) (explaining that an administrative interpretation of a provision is given great weight when "the subject is a complex legislative scheme necessarily requiring expertise"); *see also Frye Reg'l Med. Ctr., Inc. v. Hunt*, 350 N.C. 39, 45, 510 S.E.2d 159, 163 (1999) (explaining that "[t]he interpretation of a statute given by the agency charged with carrying it out is entitled to great weight"). Establishing a cap factor can be quite complex. That reality may partially explain why the General Assembly gave such technical guidelines and assigned most of the work to the expert actuary. This issue is therefore not one for which additional public comment would likely be of much value. Indeed, when the Board did eventually adopt a cap factor through the APA's rulemaking procedures, it adopted an identical cap factor to the one it previously adopted under N.C.G.S. § 135-5(a3).

Plaintiff argues that because, in its view, school boards may not be able to handle the financial burden of making the payments required by the cap factor in some cases, the school boards and the public should have a say in the determination of the cap factor. The General Assembly, however, has already made a policy determination to address this issue. It mandated that a cap factor (1) shall be established, (2) based on the actuary's recommendation, (3) that applies only to those retirees earning an average of over $100,000 per year during their four highest paid

years, and (4) that no more than three quarters of one percent of retirement plans could be affected by the cap factor.

Moreover, we should respect the Board's procedures because the Board has adopted actuarial recommendations through informal procedures for years without the General Assembly intervening to stop it. In construing administrative statutes, this Court gives "great weight to the administrative interpretation, especially when, as here, the agency's position has been long-standing and has been met with legislative acquiescence." *Wells*, 354 N.C. at 319–20, 553 S.E.2d at 881. At least since the latest version of its rule, which has been in effect since 1981, the Board has had the policy of adopting actuarial recommendations by resolution, not by formal rulemaking. 20 N.C. Admin. Code 2B.0202(a). The General Assembly has not stepped in to require it to do otherwise, so we may presume that the practice comports with legislative intent. *See Wells*, 354 N.C. at 319, 553 S.E.2d at 881 ("When the legislature chooses not to amend a statutory provision that has been interpreted in a specific way, we assume it is satisfied with the administrative interpretation."). Furthermore, the General Assembly affirmatively acted in the past to encourage this procedure. *See generally* N.C.G.S. § 135-6(l) (providing the process the Board is to utilize regarding actuarial assumptions). The General Assembly thus did not intend for the APA's procedures to apply.

The majority misses the preceding statutory analysis because it mistakenly mines from this Court's dated case law a presumption that the APA's procedures

always control agency action unless a statute explicitly says otherwise. That blanket presumption applied under an older version of the APA, but it does not any more. Before 1991, the text of the APA explained that it would "apply to every agency . . . except to the extent and in the particulars that any statute . . . makes specific provisions to the contrary." *See* An Act to Improve the Administrative Rule-Making Process, S.L. 1991-418, § 2, 1991 N.C. Sess. Laws 791 (removing the quoted language in 1991). This Court concluded when that text was in effect that "the General Assembly intended only those agencies it expressly and unequivocally exempted" from the APA to not be governed by it, and that any exempted agency is only exempted "to the extent specified by the General Assembly." *Vass v. Bd. of Trs. of Teachers' and State Emps.' Comprehensive Major Med. Plan*, 324 N.C. 402, 407, 379 S.E.2d 26, 29 (1989).

In 1991, however, the General Assembly amended the APA and removed that language. *See* An Act to Improve the Administrative Rule-Making Process, S.L. 1991-418, § 2, 1991 N.C. Sess. Laws 791. Now, the only provision containing similar language relates to "contested cases." *See* N.C.G.S. § 150B-1(e) (2017) ("The contested case provisions of this Chapter apply to all agencies and all proceedings not expressly exempted from the Chapter."). Rulemaking and other methods of adopting policies are not "contested cases."

Since the time the General Assembly amended the APA in that way, this Court has expressly presumed that the APA's procedures apply only when a "contested case"

was central to the dispute. *See, e.g., Empire Power Co. v. N.C. Dep't. of Env't, Health, and Nat. Res., Div. of Envtl. Mgmt.*, 337 N.C. 569, 573–74, 447 S.E.2d 768, 771 (1994). This Court has not held that the APA as amended presumptively applies to agency rulemaking or other policy enactments. I therefore disagree with the majority that the procedures found in the APA presumptively apply to the Board's adoption of a cap factor. If the majority is to recognize such a presumption, it must do so entirely based on an interpretation of the relevant statutes; our precedent does not demand it. Yet, as discussed above, a reasonable interpretation of the statutes does not support the majority's decision.

The specificity of the statute at hand, and its technical subject matter, rebuts any presumption that the APA's procedures apply. In subsection 135-5(a3), the General Assembly gave specific directions to the Retirement System about how to limit pension spiking, and those directions did not require formal rulemaking. That more detailed and targeted provision supplants the APA where the two provisions overlap. The Retirement System has long adopted the recommendations of actuaries, who have special expertise, through resolution of the Board and publication in the meeting minutes. The General Assembly intended these procedures to be sufficient.

I respectfully dissent.